THE STATE v. JUSTICES, &c., OF MIDDLESEX.

1. The Supreme Court has a right to examine into the proceedings of
an election, held under an act of assembly; and in case they are illegal,
to declare the election void.

2. Where there is evidence of the admission of illegal votes, the case is
a proper one for the interference of the court.

This was a *certiorari* to remove the proceedings of the
election had for fixing on the place where the court house for
the county of Middlesex should be erected.

KINSEY, C. J.

The state of this case now before us for our decision is as
follows:

By an act of the legislature of November 30th, 1792, the
sheriff of the county of Middlesex is directed to advertise an
election, for fixing on a place where the jail and court house
for the county shall be erected; and gives liberty to all to
propose the place where these buildings shall be located.

In the second section of the act it is declared that the elec-

tion shall be by ballot, and shall be conducted in the manner and under the regulations and penalties prescribed for the election of members of the assembly; and it is added that the sheriff, and at least three of the inspectors, shall certify, under their hands and seals, to the board of justices and free-holders, the place for which the greatest number of votes shall be given, and that shall be the place where the buildings shall be erected. It proceeds to authorize the assessors and collectors to raise a sum of money for these purposes, as well as to purchase a suitable lot for the buildings, and declares them to be the court house and jail of the county.

These proceedings have been brought before this court by a *certiorari,* issued on the application and complaint of some [245] of the inhabitants of ———, from which it appears that the majority of votes in favor of New Brunswick amounted to one hundred and twenty-two.

In November, 1793, an application was made for a rule of court for taking depositions, and under this rule a number of affidavits have been taken and laid before us, viz., those of Ebenezer Ford and Matthias Halsted, two of the judges of the election; of John M. Halsted, one of the clerks, and of three other persons, stating and confirming the facts.

From this testimony the following facts fully appear:

1st. The inspectors or some of them objected to some of the voters, and demanded that they should be put to the test required by the act of assembly. Instead, however, of this, the bare declaration of the voter was received as conclusive evidence of his being qualified; and one of the inspectors says that he was openly insulted for making the request. This fact appears from the depositions of several of the witnesses.

2d. A negro man was admitted to vote, who had no legal residence; and his declaration that he had been manumitted in another state, was received as sufficient proof of his being entitled to a vote.

3d. There is strong and cogent proof leading to the persuasion that during the election, the box in which the tickets were deposited was broken open, from certain marks of vio-

The State v. Justices, &c., of Middlesex.

lence not upon it when the election commenced, and which appeared before its conclusion.

4th. The electors were publicly addressed in favor of New Brunswick; and in order to induce them to fix upon that place as the site, they were told that £1,000 would be advanced by that town towards defraying the expense of the buildings, provided they were to be erected there.

These are some, though by no means the whole of the facts, which appear in these affidavits.

Notice was given on the part of the applicants for the *certiorari*, of the taking of these depositions; no person however, appeared on behalf of Brunswick to cross-examine the witnesses—and, what in my opinion is even more remarkable, no counter affidavits have been produced, to disprove any of the facts set forth in those taken on the part of the prosecu- [246]-tion; some of which contain serious charges, alleging facts which strike at the first principles of good government, as well as at the freedom of election.

Two counsel have appeared in support of the *certiorari*, who have argued the cause, and have moved to vacate the certificates on the grounds set forth in the affidavits.

*Mr. Leake*, of counsel for New Brunswick, has appeared and informed the court that he did not on this occasion design to hold any argument with regard to the *certiorari*— that the board of justices and freeholders did not conceive that this court had any jurisdiction of the matter in question; and that since the election in 1793, the prosecutors had ample opportunity to apply to the legislature for the redress which that body alone was competent to afford them.

As the defendants and others inculpated, therefore, have declined to argue the question of jurisdiction, and have made no attempt to disprove any of the facts set forth in the affidavits, these facts must be taken as fully proved.

Thus the matter stands at present before us. I own that I should have been better pleased if an application had been made to the legislature, who if they thought the matter required it, might have applied a more complete remedy than

it is in the power of this court to afford.   This course, how-
ever, has not been pursued.   Application is made to us for
redress, and we should be unworthy of holding these seats,
were we to shrink from performing a duty imposed upon us,
and from giving our opinion upon a question of so much im-
portance in its immediate and remote results to the commu-
nity at large.

It is scarcely necessary to premise, that as judges and in-
dividuals, we disclaim any kind of interference in the ques-
tion where these buildings shall be erected.   If the county
has had an election conducted in the manner prescribed by
law, it is our duty and it is our wish to support it.   If, how-
ever, this court has a right to inquire into the question whether
there was a legal election, or whether the law was prosti-
tuted and trodden down to subserve the interests, or to gratify
the passions of faction ; and it shall appear that the election
has not been comformable to the design and intention of the
[247] legislature, who had no other in view than a fair one,
as free and as fair an election as that under which they sit as
the representatives of the people of the state, then it is a
duty imposed upon us by the situations we hold, and which
we owe to the public, to express our sentiments fully and
openly, and to enforce our opinion, as far as the powers
reposed in us will permit, whether it is to affect an indi-
vidual, a county, or the state in general.

The jurisdiction of this court has been indirectly ques-
tioned by the justices and freeholders, and, therefore, it
becomes necessary to inquire, in the first place, whether we
have any right to examine into the matters brought before
us, and to adjudicate upon them, and, if this question be
decided in the affirmative, then whether the facts proved
afford a sufficient ground for our interference.

The first question has been argued by the counsel without
any very elaborate preparation.   Cases, however, have been
cited from 1 *Salk.* 146 ; 1 *Bac. Abr.* 561, 2, ( *Wilson's edit.*) ;
4 *Vin. Abr.*, " *Certiorari,*" 329, 336, §§ 19, 20, 21, and
*Fitzgib.* '245, to show the general powers of the court to

interfere in all cases where either an individual or a collection of persons have sustained any injury. Indeed, as the objection was altogether a novel one, and as the practice in this court, ever since I knew anything of it, has been to exercise a jurisdiction in all cases of this kind, and to give a remedy for injustice, whether committed under pretence of law or without any such pretext, few cases were necessary to be referred to. If the defendants, however, had not declined taking any part in the discussion, I should have been pleased to hear what was to be said in support of a position which, to me, wore so new an aspect. A second argument has not, however, been requested, and, having given to this subject as much consideration as our limited time and other avocations would permit, and, entertaining no doubt, ourselves, upon the subject, there is no reason to postpone giving our judgment.

The question as to the jurisdiction may be considered in two points of view: 1st. As it is affected by the acknowledged principles of law, and cases that have been decided. 2d. On the reason of the thing. As to the first—

[248] Lord Coke, speaking of the jurisdiction of the Court of King's Bench, in whose place we stand, says that, before the time of Edward I., the Chief Justice was created by letters patent, the form of one which he gives: "The king to the archbishops, bishops, barons, &c., &c.—Whereas, for our own safety, and to preserve the tranquillity of our kingdom at large, and to do and execute justice to all and each of our subjects, we have appointed our trusty and well-beloved A B, Chief Justice of England." He remarks that this officer was created for three purposes: 1st. The safety of the king. 2d. The tranquillity of the realm. 3d. To do justice to everybody. This was the original jurisdiction of the court. Indeed, no government can be properly carried on, unless a power resides somewhere, to afford justice to every individual. Protection of the people is the basis upon which all government is founded.

Coke, in the following page, observes that this officer is

now created by writ, which, however, "comprehends the substance of the former letters patent, and includes all that was intended to be granted to him by them."

If this be law, and I believe it has never been questioned, the power of this court to give redress is as unlimited and universal as injustice and wrong can be. Unless, therefore, the board of justices, &c., can show that they form an exception to this rule; that whether they do or do not execute the powers delegated to them by the legislature, in the mode prescribed by the act of assembly; that if, instead of executing these delegated powers for the general good of the community, they should prostitute them to subserve the interests of a party, still, they are not amenable to any legal tribunal, as all other persons invested with powers are—it is the duty of this court to review their proceedings, so far as to see that justice is done, and to vacate them if they have swerved from the legal line of their duty, or employed their authority for the purposes of oppression.

To a man in any degree versed in the law, much need not be said to show the reason why the Court of King's Bench exercised this unlimited authority. The king is the fountain from which all justice flows; the subjects are entitled to [249] the protection of all their rights; and while they are thus protected, and no longer, do they owe allegiance to him. These duties are reciprocal. In former times he was accustomed to sit in that court, and to administer justice; and to every purpose of jurisdiction he is still supposed to be present. Hence, to say the court does not possess jurisdiction commensurate with the injury that may be inflicted, shows great ignorance of the law and the constitution.

Lord Coke is not more full and comprehensive in his language than Bracton, nor is either of them more so than the statute of 20 *Edw. III.*, by which it is enacted that "the justices shall do even law and execution to all our subjects, rich and poor, without having regard to any person, and without omitting to do right for any letters, &c., or by any other cause."

Another principle of the law is entitled to considerable weight in settling this question. It is a rule that when you plead to the jurisdiction of the court, you must point out in your plea another court which has jurisdiction, and the reason is obvious; the subject has a right to protection and redress somewhere. I never have heard it directly contended that injuries may be committed beyond the jurisdiction of every tribunal. If, therefore, this court has not cognizance of this cause, it was incumbent on the defendants to show where the injury complained of may be redressed; for to assert that a person injured is without redress in any court, is to say what never did exist under our constitution or the common law. *Freeman* 99; 1 *Mod.* 44; 8 *Mod.* 331; 10 *Mod.* 48; 4 *Inst.* 71. In this last book the language is particularly comprehensive: "This court hath not only jurisdiction to correct errors in judicial proceedings, but other errors and misdemeanors extra-judicial, tending to the breach of the peace or oppression of the subjects, or raising of faction, controversy, debate, or any other manner of misgovernment; so that no wrong or injury, either public or private, can be done, but that this shall be reformed or punished in one court or other by due course of law." And in the same [250] words does Lord Coke express the resolution of the court in *Bagg's case*, 11 *Rep.* 98.

Hawkins, a writer of considerable eminence and authority, seems as ignorant of this limitation of the powers of the court as Lord Coke. Speaking of the powers of the King's Bench, he says: "It is certain that this court is entrusted with the highest jurisdiction, not only over all capital offences, but also all other misdemeanors whatever of a public nature, tending either to a breach of the peace or oppression of the subject, &c., so that whatever crime is manifestly against the public good, it comes within the connusance of this court, though it do not directly injure any particular person; neither can any private person, who has not forfeited his right to the protection of the law, suffer any kind of unlawful violence or gross injustice against his person, liberty

T

or possessions, from any person whatever, without a proper remedy from this court." "Neither is it necessary, in a prosecution for any such offence in this court, to show a precedent of the like crime formerly punished here, agreeing with the present in all its circumstances; for this court being the *custos morum* of all the subjects of the realm, wherever it meets with an offence, contrary to the first principles of common justices and of dangerous consequence to the public, if not restrained, it will adapt such punishment to it as is suitable to the heinousness of it." 2 *Hawk.* 8, *B* 2, *c.* 3, §§ 3, 4.

One mode of exercising this power is by way of *certiorari* to bring the proceedings before the court. But the court are to exercise a discretion in allowing them, and not to suffer them to be issued for vexatious purposes, (*The King* v. *Jenkinson*, 1 *T. R.* 82,) and that discretion is sometimes exercised before an injury actually accrues to any one, by issuing a *mandamus*, as in the case of *The Queen* v. *Commissioners of the Land Tax*, 11 *Mod.* 206, (see, however, *Butler* v. *Cobbet*, *Ib.* 254,) where the court granted a *mandamus* to tax the lands equally. So in the case of *The King* v. *Commissioners of the Land Tax*, 1 *T. R.* 146, a *mandamus* issued to the commis-[251]-sioners to elect a clerk. In *The King* v. *Mayor, &c., of York*, a *mandamus* issued, requiring the mayor to put the corporate seal to the certificate of an election. In the case of *The King* v. *Barker and others*, 3 *Burr.* 1265, it issued to the trustees of a meeting-house, to admit a dissenting teacher to the use of the pulpit. In this case, Lord Mansfield observed, " Here is a function, with legal emoluments, and no specific legal remedy. The right depends upon election, which interests all the voters. Should the court deny this remedy, the congregation may be tempted to resist violence by force. In this case the defendants refuse to go to a new election, or try the election already made in a feigned issue. To deny this writ would be to *put them out of the protection of the law.* The case is entitled to protection, and it can be had only by granting this writ."

In *The King* v. *King and others*, 2 *T. R.* 234, (see also 2 *T. R.* 290, 337, *The King* v. *Bishop of Ely*,) the court quashed a *certiorari* issued for the removal of all the assessments of the land tax in a particular district, for the year 1787, on the ground of public inconvenience; but so far from questioning the power and authority of the court to review these proceedings by *certiorari*, Ashhurst, J., in his opinion, expressly says, " if we quash the *certiorari* on the grounds of public inconvenience, we must take care, at the same time, that the party who applied for it shall not suffer any inconvenience by quashing it."

These cases, in my opinion, fully show the jurisdiction of this court, and preclude the necessity for many additional observations; however, it may not be amiss to subjoin the following:

1st. The jurisdiction of this court is original, and has subsisted beyond the memory of man. It is general and universal, criminally, to punish every breach of good order, and of the peace of society; civilly, to give a remedy and a compensation for every injury. It is restricted by no rule to particular evils, and, until the contrary is proved, it has a right to vacate any act committed under color of a law, directly [252] contrary to that law, and more especially when this act tends to oppression, and to deprive the inhabitants of the free exercise of their elective franchise.

2d. Where the injury is extensive, and involves any considerable portion of the community, it is better to take up the business in gross, and to vacate the proceedings, than to put every individual to the necessity of working out his own redress by a separate suit.

3d. The right to grant a *mandamus* to an officer, commanding him to lay an equal tax, or to perform his duty when he has neglected it, shows that this court has the right to superintend the proceedings of officers appointed to execute particular laws, and to judge whether they have complied with the requisitions of the law.

4th. The acts of parliament mentioned in some of the cases

that have been referred to, contain no words giving the court jurisdiction, or subjecting the officers to their control. What they did was under the ancient and original jurisdiction of the court, and in execution of a power which must be vested in some tribunal, in order that the people may be protected in their just rights.

5th. The court exercises a jurisdiction over the elections of officers chosen under an act of parliament, in public corporations, and even in the case of private trusts. The reason is the same—the power is necessary for the preservation of the peace of the community—and with what color can it be pretended that this court, whose duty it emphatically is to take care that justice is done to every one, has no power to protect the interests and redress the wrongs of an entire county?

6th. If such a power is not lodged in this court, the citizen, as Lord Mansfield said, " is put out of the protection of the law."

7th. That the rights of electors, and that elections should be conducted fairly, are points upon which we cannot be too jealous. Whenever these rights are invaded; whenever a law intended to effectuate one purpose is perverted from its design, either by fraud or illegal practices, and made to subserve illegal and private purposes; or wherever allegations of [253] this nature are substantiated by evidence, there is no man and no body of men elevated so high in society, as to be exempt from the jurisdiction and supervision of some court.

The basis on which this power is exercised, is a solid one, because necessary to the peace of the community, and without which the main design of government, to wit, protection, cannot be afforded. This interference, however, is itself limited and controlled by the laws of the land, subjected to a revision in the last resort by the governor and council, and it cannot do injury.

To say that the legislature may apply a remedy is no answer at all, or a very indifferent one. It is subversive of all liberty to unite in one body the legislative and executive

The State v. Justices, &c., of Middlesex.

functions, or to permit that those who create the law, should assume the powers of a court of justice, and determine questions of any kind, which ought to be, and constitutionally may be settled by judicial tribunals. It is their province to make the laws, but they have no right or power to enforce their execution, and there is no ground upon which they can claim cognizance of this cause which would not equally apply to any other cause whatever.

As to the second question, whether the facts proved afford sufficient grounds for our interference in the present case, I observe—

1st. The act of November, 1792, declares that the election shall be conducted in all respects in the manner, and under the same regulations as the election for members of the assembly.

By the act of 1783, the giving, or offering, or promising any fee, reward, &c., or any undue influence to prevail on persons to vote is prohibited, and a penalty of £50 imposed on the offender. This act did not introduce any new law; it did no more than what the common law had done long before, and no more than what common sense tells us is essential to all elections in a good government; that they should be freely and fairly had, as the only means of giving public satisfaction, and effecting the public convenience. Every deviation is an encroachment on the rights of the people, and an invasion of that good order which is essential to the peace [254] of the country, and it behooves the court to interpose, and to prevent all attempts of this kind.

If the facts stated in the affidavits before us are consistent with truth, and there is no ground for questioning it, what opinion must be entertained of the election now complained of?

By the 8th section, if a vote is objected to, it shall not be received, until the person who offers it takes the oath of allegiance, and, if required, that he is worth £50, and has resided within the county one year. The provision is a good and highly reasonable one; it is calculated to keep the right of

election in the hands of those who have property at stake, and who have resided in the county long enough to enable them to acquire a knowledge of the characters of the candidates between whom they are to choose. According to the affidavits, the inspectors took no notice of objections made by one of their own body; and the only effect it produced was to subject the proposer of it to insult. The bare word of one man that he was qualified, the affirmation of a black man that he had been manumitted, were held sufficient to entitle these persons to vote for the place where the court house and gaol were to be erected. Again, can there be a doubt from the evidence but that the box in which the tickets were deposited, was clandestinely broken open during the time of the election? For what purpose and with what view were the voters addressed, and told that Brunswick had appropriated, or would appropriate £1000 to defray the expenses of these buildings? Was not this to induce persons to vote for that place? Is there any difference between giving money for a vote, and undertaking to pay a tax for a person who is legally liable, and must be burthened with it? Is there any difference between giving a voter a sum of money, and the securing him from the payment of it? Is an election of this nature, conducted in the words and spirit of the act, in all respects, and under the regulations prescribed for the election of the representatives in the legislature? I trust no man who has the real interests of the state in view, can wish that an election carried on in this manner should stand.

We are therefore of opinion that these proceedings are properly inquirable into by this court, and that we have the [255] power, and are called upon to declare them void if not carried on under and pursuant to the directions of the act of assembly. In expressing this opinion, we hold the same language which was held by the legislature in November, 1785, relative to an election of members of assembly, in which they say that an election illegally conducted is void.

If this be so, all acts founded on this illegal election must likewise be void, and the assessments, &c., are of no validity.

No one can be legally compelled to pay them; and if this court, on a *certiorari* in each case, would be compellable to say so, it is far better that the proceedings should be vacated *in toto* at once, to prevent much unnecessary expense and trouble. We are, therefore, unanimously of opinion that the election is illegal and void, and must be quashed.

Note.—The following endorsement appears on the opinion of the Chief Justice and in his handwriting: "Jan. 7, 1795, on error before governor and council, this judgment was reversed, 8 to 3. I have heard the ground of this reversal was that the Supreme Court had no jurisdiction." *Sed quere.*

Cited *in State* v. *Woodward*, 4 *Hal.* 29; *Mor. Canal* ads. *State*, 2 *Gr.* 427; *N. J. R. R. & Tr. Co.* v. *Suydam*, 2 *Harr.* 40; *State* v. *Clerk of Passaic*, 1 *Dutch.* 355; *City of Camden* v. *Mulford*, 2 *Dutch.* 55; *Eames* v. *Stiles*, 2 *Vr.* 493; *Allen* v. *Tyler*, 3 *Vr.* 502; *State* v. *Jersey City*, 5 *Vr.* 400.